IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN WESLEY WILLIAMS,

    Plaintiff,                      No. CIV S-06-1238 FCD GGH P

    vs.

LIEUTENANT FLINT, et al.,        <u>ORDER AND</u>

    Defendants.               <u>FINDINGS & RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is the summary judgment motion filed September 7, 2007, on behalf of defendants Blackburn, Cervantes, Flint, Hill, Holmes, Kernan, Leiber, Malfi, Mayfield, O'Brian, Smith and Ybarra. On May 14, 2008, defendant Jubb filed a separate summary judgment motion.

        After carefully reviewing the record, the court recommends that defendants' summary judgment motion be granted.

II. <u>Summary Judgment Standards Under Rule 56</u>

        Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

1

1  matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On December 21, 2006, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409,

411-12 (9th Cir. 1988).

III. Plaintiff's Claims

This action is proceeding on the amended complaint filed October 5, 2006. Plaintiff alleges that following his transfer to California State Prison-Sacramento (CSP-Sac) in December 2004, he was improperly classified as a gang member/affiliate. Through 2005, defendants failed to respond to his appeals regarding this issue.

On May 25, 2005, plaintiff was informed that he was being transferred to a different building. During the transfer process, plaintiff became emotionally distressed and requested to be seen by a mental health professional. Defendants denied this request. Plaintiff then attempted to kill himself, or more accurately as set forth in the undisputed facts of this case, made a suicidal gesture.

On June 1, 2005, plaintiff was released from mental health housing and taken to disciplinary segregation, where he was "advertised" as a gang member. On June 2, 2005, plaintiff was released to the general population where he was improperly housed with a gang member. Plaintiff again suffered mental distress and was admitted to the mental health crisis unit.

IV. Discussion

    A. Failure to Protect

Defendants have submitted a lengthy statement of undisputed facts, which includes many references to plaintiff's mental health records filed under seal. See Defendants' Exhibit B. These mental health records reveal that plaintiff suffers from serious mental illness and has been diagnosed with paranoid schizophrenia on more than one occasion. Plaintiff does not dispute that he suffers from mental illness. Defendants argue that plaintiff's mental illness contributes to his fears of harm. The court will discuss plaintiff's mental illness to the extent it finds it material to the Eighth Amendment claim.

/////

*Undisputed Facts*

The following facts are undisputed regarding plaintiff's Eighth Amendment claims. The court will include mention of some disputed facts as they clarify the undisputed facts.

On April 30, 2004, plaintiff arrived at the North Kern State Prison-Reception Center. Defendants' Exhibit A, attachment 1, p. 24. The intake form states that plaintiff identified himself as a member of the Blood street gang.[1] Id., p. 26.

On November 26, 2004, staff conducting an archive review of plaintiff's file for a prior incarceration from which plaintiff was discharged noted that plaintiff was an ex-member of the swans Blood street gang. Id., p. 28.

On December 7, 2004, plaintiff was transferred to California State Prison-Sacramento (CSP-Sac). Id., p. 24.

On December 16, 2004, plaintiff appeared before a classification committee, of which defendant Smith was a member. Id., p. 31. The classification committee report states that plaintiff had no enemies and that his gang status was "none." Id. The committee released plaintiff to the general population in Facility C. Id.

On February 21, 2005, plaintiff submitted an administrative grievance asking that defendant Smith be removed and investigated in part because he had improperly labeled plaintiff as a member of a gang. Id., pp. 45-46. Defendant Mayfield refused to address this issue because the grievance was not timely filed. Id., p. 45. The Second Level Appeal stated that plaintiff's gang/disruptive group issue was being addressed in appeal no. 05-00507. Id., p. 53.

---

[1] In his declaration submitted in support of his opposition, plaintiff states that during the intake interview at NKSP he was asked whether or not he was a gang member. Plaintiff's declaration, ¶ 3. Plaintiff responded that he was not. Id. Plaintiff was then asked what street gang dominated the area in which he was raised. Id. Plaintiff responded that it was the Blood gang. Id. Plaintiff now contends that the intake form from NKSP erroneously stated that he was a member of a gang. While this may be true, the defendants at CSP-Sac are not responsible for this mistake. It is still undisputed that the intake form, which they reviewed, stated that plaintiff was a gang member.

1    Plaintiff filed appeal no. 05-0507 on March 25, 2007.  Id., p. 56.  On April 25,
2    2005, the appeal was denied at the second level.  Id., p. 65-66.  In this appeal, plaintiff claimed
3    that on March 24, 2005, he became aware that defendant Smith identified plaintiff as an active
4    street gang member.  Id., p. 65.  Plaintiff claimed that this occurred because plaintiff filed a
5    lawsuit against Warden Kernan.  Id.  The response from Warden Kernan, dated April 25, 2005,
6    stated,

> A review of your complaint revealed that you are listed by self-admission as a "SWANS BLOOD" member street/disruptive group.  Your CDC Form 1882 dated April 30, 2004, lists this information based on your self-admission.  Your Probation Officer Report dated November 23, 2004, also lists the same information.  This information is insufficient to validate you as a street gang/disruptive group member based on current departmental criteria.  Your gang status is listed as NONE based on the current criteria and information.  Your housing status based on this information would indicate that you could be housed with another inmates listed as a "BLOOD."
>
> Your allegation that CCI Smith and CCII J. Mayfield listed you as an active gang member is completely unfounded...

Id., p. 66.

On April 19, 2005, plaintiff told a psychiatrist that he was distressed that custody had him classified as a Blood.  Defendants' Exhibit B, attachment 1, p. 103.  Plaintiff said that he was the victim of a conspiracy.  Id.

On April 27, 2005, a gang investigator filed a report stating that he had reviewed plaintiff's central file and interviewed plaintiff.  Defendants' Exhibit A, attachment 1, p. 76.  He reported that there was insufficient evidence to validate plaintiff as a member or associate of any prison gang or disruptive group.  Id.  The report stated,

> During the interview with WILLIAMS, he stated that he was associated with the disruptive group known as "Swans Bloods" and became an ex-member when the group became aware of his conviction of PC 288(a)(c) Forcible Oral Copulation resulting in a "R" suffix being placed in his central file.  This information is verified via CDC 812 dated November 26, 2004 that states: WILLIAMS is an ex-member of the disruptive group Swan Bloods.  A check of WILLIAMS most recent 128-G lists WILLIAMS association with Gangs/Disruptive Groups as "none."  WILLIAMS requested to have the gang information updated and to reflect his gang status as non-affiliated.

6

*****

This identification for member/associate requires at least three independent source items of documentation indicative of actual membership or gang involvement. There were insufficient source items of gang activity by WILLIAMS for validation. The IGI will update his gang status as being non-affiliated with any prison gang or disruptive group at this time.

There were no documented enemies listed on WILLIAMS' CDC-812 at SAC. WILLIAMS' behavior should be closely monitored whenever gang activity or association is present. If any additional information should become available, WILLIAMS should be reevaluated.

Id.

On June 2, 2005, plaintiff was transferred from Building 2 to Building 5 in Facility C, where he was housed until June 4, 2005. Defendants' Exhibit O, ¶ 6. During these three days, plaintiff was housed with an inmate who was listed as an associate of the Blood street gang. Id.

Whether plaintiff was allowed to choose a cellmate upon his arrival at Building 5 on June 2, 2005, is disputed. According to defendants, when plaintiff arrived at Building 5, he was given the opportunity to review a picture board showing vacant beds for cells with non-affiliated inmates. Defendants' Exhibit No, no. 13. Plaintiff was also given an opportunity to talk to these inmates in those cells before selecting a cellmate. Id. After plaintiff refused to be housed with any of these inmates, he was assigned to a cell with an inmate who was a Blood gang member, but not an enemy.

According to plaintiff, when he arrived in Building 2, defendant Ybarra told him that he would be housed with a Blood gang member, and that if he refused, he would be returned to ad seg. Plaintiff's declaration filed in support of opposition, ¶ 10. Plaintiff alleges that defendant Ybarra did not let him look at a photo board of inmates with no gang affiliation. Id.

Plaintiff was housed in a single cell in Facility A, building 8 from June 4, 2005, to June 7, 2005. Defendants' Exhibit O, ¶ 7. From June 7, 2005, to August 5, 2005, plaintiff was housed in Facility A, building 3, with an inmate identified as a Blood gang member, but not an

enemy of plaintiff. Id., ¶ 8. From August 5, 2005, to August 18, 2005, plaintiff was out-to-court in Los Angeles County. Id., ¶ 9.

On June 13, 2005, plaintiff submitted a grievance claiming that defendant Hill was labeling him as a gang member by forcing him to house with a gang member. Defendants' Exhibit A, pp. 114-115. Plaintiff requested that defendant Hill be prohibited from "engaging in deceptive or corruptive practices." Id., p. 118. Defendant Ybarra granted this appeal. Id. On July 12, 2005, the CSP-Sac appeal coordinator reviewed plaintiff's appeal and sent him a request asking him if he was still housed with a gang member or labeled as a gang member. Id., p. 121. On August 18, 2005, defendant Kernan granted the appeal at the second level, finding that plaintiff was housed in the Enhanced Outpatient Program (EOP) with no gang affiliation. Id.

When plaintiff returned from out-to-court status on August 18, 2005, he was housed in Facility A, Building 1, until October 23, 2005. Defendants' Exhibit O, ¶¶ 10-11. During that time, plaintiff had three cellmates, none of whom were listed as gang or corruptive group members or associates, or enemies of plaintiff. Id.

On October 23, 2005, plaintiff moved to Facility A, Building 3. Id., ¶ 11. Plaintiff's cellmate was not a member of a gang or disruptive group, nor was he an enemy of plaintiff. Id. Plaintiff was single celled in Facility A, Building 3, from November 3-17, 2005. Id., ¶ 11.

On November 17, 2005, plaintiff was housed briefly in Facility C, Building 5, before being transferred the same day to Building 4, where he was housed until July 19, 2006. Id., ¶ 12. During that time, plaintiff had a series of 6 cellmates, two of whom were listed as gang members or associates, and none were listed as enemies of plaintiff. Id.

On July 19, 2006, plaintiff was moved to Facility C, Building 5, where he was housed until August 11, 2006, with a series of 4 inmates, 1 of whom was listed as a gang member or associate. Id., ¶ 13. None of these inmates were listed as plaintiff's enemy. Id.

/////

On August 11, 2006, plaintiff was transferred from Facility C to Facility B. Defendants' Exhibit A, attachment 1, p. 330. The record contains no other information regarding plaintiff's cellmates at CSP-Sac after this time. On March 23, 2007, plaintiff was transferred away from CSP-Sac.

*Legal Standard*

Under the Eighth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other inmates. Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970 (1994). The Eighth Amendment is violated when the inmate shows that he is incarcerated under conditions posing a substantial risk of serious harm, and that officials displayed "deliberate indifference" to inmate health or safety. Id. at 834, 114 S.Ct. 1970. A prison official is deliberately indifferent to a substantial risk of serious harm if that official is subjectively aware of the risk and does nothing to prevent the resulting harm. Id. at 828-829, 114 S.Ct. 1970. Deliberate indifference requires that an official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S.Ct. 1970.

*Analysis*

In his first claim, plaintiff alleges that following his transfer to CSP-Sac he was improperly classified as a gang member/affiliate. As a result of this classification, plaintiff contends that he was improperly housed with gang members. In his second claim, plaintiff alleges that on June 2, 2005, he was improperly housed with a gang member which resulted in him being labeled as a gang member. Plaintiff argues that because he was housed with Blood gang members, he was forced to socialize with Blood gang members on the exercise yard, which made him vulnerable to attacks from rival gangs. Plaintiff does not claim that he suffered any physical harm as a result of being housed with rival gang members, but that he suffered emotional distress.

/////

As to both claims, defendants argue that they are entitled to summary judgment because plaintiff was not physically harmed in any way as a result of being housed with gang members. 42 U.S.C. § 1997e(e) requires a prisoner who wishes to bring a federal or civil rights action for mental or emotional injury to make a prior showing of physical injury. In the Ninth Circuit, this requires "a prior showing of physical injury that need not be significant but must be more than de minimis." Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002). Because plaintiff alleges no physical injury as a result of defendants' alleged failure to protect him from other inmates, § 1997e(e) bars his claim. Defendants should be granted summary judgment on this ground.

### B. Inadequate Medical Care

Plaintiff claims that on May 25, 2005, he was informed that he was being transferred to a different building. During the transfer process, plaintiff became emotionally distressed and requested to be seen by a mental health professional. Defendants denied this request. Plaintiff then attempted to kill himself.

*Legal Standard for Eighth Amendment Claim*

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an

injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense – subjective standard – disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at 1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at 1981. However, obviousness per se will not impart knowledge as a matter of law.

*Analysis*

It is undisputed that on May 25, 2005, plaintiff was supposed to move to new housing in Building 5 and that he then scratched his wrists. The facts regarding what led up to

11

1 this incident are disputed.

2      According to defendants, on May 25, 2005, plaintiff was placed in a holding cell
3 pending the move. Plaintiff told defendant Blackburn that he refused to move because the
4 purpose of the move was to harass him. Defendants' Exhibit C, no. 2. Defendant Blackburn told
5 plaintiff that the purpose of the move was not harassment and that if he refused, he would be
6 handcuffed. Id. Plaintiff then returned to his cell to pack his property. Id.

7      Later, defendant Blackburn was told that plaintiff wanted to see mental health
8 staff. Id. Defendants' Exhibit C, no. 2. Defendant Blackburn arranged for plaintiff to be
9 escorted to a holding cell in the sallyport for transport to the mental health clinic. Id. Officer
10 Advincula heard plaintiff say that he feared for his life and that defendant Blackburn was going
11 to kill him. Id. Based on this comment, defendant Flint prepared an order for plaintiff to be
12 placed in ad seg. Id. Officer Blackburn does not recall plaintiff telling him that he was suicidal.
13 Id. Had plaintiff stated that he was suicidal, then Officer Blackburn would have contacted
14 mental health staff or ordered another officer to do so. Id.

15      Defendant Cervantes was the Sallyport Officer on Facility C that day and was
16 responsible for supervising the movement of inmates and staff in and out of the sallyport area.
17 Defendants' Exhibit D, no. 1. While in the holding cell, plaintiff asked to see the mental health
18 staff two to three times. Id. Defendant Cervantes went to the facility C Clinic where the
19 psychiatrists and psychologists were located to inform them of plaintiff's request. Id. Each time
20 he went there, there were no mental health staff present. Id. Defendant Cervantes told plaintiff
21 that mental health staff were not available, but that they would be sent down to see him when
22 they were. Id. Plaintiff did not tell defendant Cervantes that he felt suicidal.

23      At some time while plaintiff was in the holding cage, defendant Cervantes saw
24 that plaintiff was handcuffed and bleeding. Id., no. 2. It looked as if plaintiff had cut himself on
25 the holding cage. Id. Medical staff were summoned. Id. Plaintiff was admitted to a mental
26 health crisis bed on suicide watch. Defendants' Exhibit B, attachment 1, p. 106.

1    A psychiatrist who saw plaintiff later that day noted that plaintiff had been
2 agitated and fearful for some time. Id., p. 106. The psychiatrist also wrote that plaintiff's recent
3 problems with custody staff which were supposed to result in plaintiff's move to a new housing
4 block exacerbated plaintiff's paranoia level and led to the suicidal gesture. Id.

5    On May 26, 2005, plaintiff was seen by a psychiatrist who noted that plaintiff was
6 not eating or drinking out of fear that custody staff was doing something to his food. Id., p. 107.
7 On May 27, 2005, the entry in plaintiff's medical records by the psychiatrist states that plaintiff
8 was ready to go to Facility A. Id. Plaintiff requested protection during transport out of fear from
9 custody staff. Id.

10    On May 31, 2008, plaintiff told mental health staff that he had gotten frustrated
11 when he was forced to move and had scratched his wrist, but had not meant to kill himself. Id.,
12 p. 111. Plaintiff said he was not suicidal and did not want to be released. Id. Staff noted that
13 plaintiff's paranoia and mistrust had not changed. Id. Staff encouraged plaintiff to take his
14 medication that he had refused that morning and cleared him for release to general housing. Id.

15    In his declaration submitted in support of his opposition, plaintiff states that on
16 May 24, 2005, while packing his personal property he told defendant Blackburn that he was
17 feeling suicidal and wanted to speak with mental health staff. Plaintiff's declaration, ¶ 12.
18 According to plaintiff, defendant Blackburn ordered Officer Advincula to escort plaintiff to the
19 clinic to be seen by mental health staff. Id.

20    According to plaintiff, he was then placed in a holding cage. Id. At that time,
21 plaintiff told defendant Cervantes that he needed to see mental health staff because he was
22 feeling suicidal. Id., ¶ 13. Defendant Cervantes told plaintiff that no mental health staff were
23 available. Id. Plaintiff states that defendant Blackburn then approached the holding cage at
24 which time plaintiff told him that he wanted to kill himself. Id., ¶ 14. Defendant Blackburn gave
25 plaintiff a medical request form and told him to fill it out and submit it when he arrived at his
26 new cell. Id. Plaintiff again told defendant Blackburn that he wanted to kill himself. Id.

13

1  Defendant Blackburn told plaintiff to either report to his new housing assignment or go to ad seg.
2  Id.  Plaintiff again told defendant Blackburn that he wanted to kill himself.  Id.

3          Defendant Blackburn then allegedly told defendant Cervantes not to let plaintiff
4  speak with anyone because he was being placed in ad seg.  Id., ¶ 15.  Plaintiff then told defendant
5  Cervantes that he was feeling suicidal and needed to see mental health staff.  Id.  Defendant
6  Cervantes ignored plaintiff's request.  Id.  Plaintiff then attempted to kill himself.  Id., ¶ 16.
7  After that, Dr. Grutti came immediately to speak to plaintiff.  Id.

8          In the reply, defendants argue that even assuming plaintiff's facts as true, they did
9  not act with deliberate indifference because they attempted to find mental health staff but none
10  were available.  Defendants argue that plaintiff merely scratched himself and later admitted that
11  he had not intended to kill himself but had done it because he was frustrated about being moved
12  to a new cell.

13          Assuming plaintiff's version of facts as true, the issue is whether defendants acted
14  with deliberate indifference when they decided to move plaintiff before he was able to see mental
15  health staff.  Defendants suggest that plaintiff did not have a "serious medical need" because he
16  later admitted that he did not intend to kill himself but acted out of frustration.  Defendants
17  suggest that plaintiff's suicidal gesture was manipulative rather than sincere.

18          It is undisputed that plaintiff suffers from mental illness.  While plaintiff later
19  stated that he did not actually intend to kill himself, the entries in his medical record from this
20  time also state that his move to a new housing block and problems with custody staff exacerbated
21  his paranoia level and led to the suicidal gesture.  He had accused defendant Blackburn of
22  threatening to kill him.  The day after the incident, plaintiff refused to drink or eat out of fear that
23  custody staff were doing something to his food.  While plaintiff may later have stated that he did
24  not intend to kill himself, his medical records suggest that at the time he actually scratched his
25  wrists his mental illness was exacerbated to the point that he required treatment by mental health
26  staff.  While plaintiff's actions may well have been manipulative, there is at least a material issue

of fact that the manipulation was accompanied by a serious medical condition.

Defendants also suggest that they did not act with deliberate indifference because they tried to find mental health staff but none were available. According to plaintiff, defendants told him that they would go forward with the move without providing treatment by mental health staff despite his repeated statements that he felt suicidal. Even if they could not locate mental health staff, the court cannot find, as a matter of law, that defendants' decision to move plaintiff, a seriously mentally inmate who had repeatedly threatened suicide, before obtaining mental health treatment did not constitute deliberate indifference.

Defendants argue that they are entitled to qualified immunity as to this claim. Qualified immunity involves a sequential three step analysis: 1) viewing the facts in the light most favorable to plaintiff whether there was a constitutional violation; 2) whether the constitutional right was well established; and 3) whether it was unreasonable for the official to believe his actions constitutional. Saucier v. Katz, 533 U.S. 194, 200-201, 121 S. Ct. 2151, 2155-2156 (2001).

Viewing the facts in the light most favorable to plaintiff, the court finds that a constitutional violation occurred, and the right to be protected from actions constituting deliberate indifference to a serious medical need is well established.

The outcome for qualified immunity does not necessarily depend on whether there remain issues of fact with respect to the alleged constitutional violation. The right allegedly violated must have been clear to defendants *in the specific context of the case*. Public officials may be mistaken in their actions and still possess qualified immunity. Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir 2001). To determine whether the right allegedly violated was "clearly established," the court must determine, in light of the specific context of the case, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202, 121 S.Ct. 2156. In addition, because the Eighth Amendment requires a specific mental element, that mental state is relevant to the qualified

immunity analysis. "[Plaintiff] must "'put forward specific, nonconclusionary factual allegations' that establish improper motive causing cognizable injury.'" Jeffers, 267 F.3d at 911.

No such evidence has been put forward by plaintiff. At best, the undisputed facts demonstrate that there was a bona fide question about plaintiff's seriousness with respect to his claimed suicidal state of mind; the officers made a judgment call about the seriousness of the claimed gestures when mental health personnel were not immediately available. If the officials here are not imbued with qualified immunity, there is no such thing as allowable mistakes in the specific context of this case, and a defendant's intent is irrelevant. Such is not the law. Defendants are entitled to qualified immunity.

### C. Conclusion

Defendants have not moved for summary judgment as to individual defendants. However, it is clear that plaintiff's claim alleging that defendants failed to provide him with mental health care on May 25, 2008, involves only defendants Blackburn and Cervantes. Accordingly, the court recommends that all defendants but for defendants Blackburn and Cervantes be granted summary judgment on the merits of the claim, and that defendants Blackburn and Cervantes be granted summary judgment on the basis of qualified immunity.

### V. Motion for Protective Order

On September 7, 2007, defendants filed a motion for protective order to seal defendants' exhibits B and O and to prohibit disclosure of these documents except to the court for in camera review and, as to exhibit B, to plaintiff. Good cause appearing, this motion is granted.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' September 7, 2007, motion for protective order is granted;

2. Defendants' Exhibits B and O are filed under seal; Exhibit B may be disclosed to plaintiff; Exhibit O may not be disclosed to plaintiff;

\\\\\

1       IT IS HEREBY RECOMMENDED that defendants' September 7, 2007, summary

2 judgment motion be granted.

3       These findings and recommendations are submitted to the United States District

4 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

5 days after being served with these findings and recommendations, any party may file written

6 objections with the court and serve a copy on all parties.  Such a document should be captioned

7 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8 shall be served and filed within ten days after service of the objections.  The parties are advised

9 that failure to file objections within the specified time may waive the right to appeal the District

10 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

11 DATED:  07/21/08

12       /s/ Gregory G. Hollows

13       UNITED STATES MAGISTRATE JUDGE

14 will1238.sj